**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------- x

Peter Kravitz, *in his capacity as the Creditor*     :
*Trustee of the Creditor Trust of Advance Watch*   :
*Company, Ltd.*                                        :

                                     **Plaintiff,**   :

                                 **-against-**     :

Marcello Binda & Simone Binda,            :

                                **Defendants.**   :

--------------------------------------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: ___April 4, 2022___

**1:17-CV-7461-ALC-SN**

**AMENDED ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

      Plaintiff Peter Kravitz, acting in his capacity as the Creditor Trustee ("Plaintiff" or "Kravitz") of the Creditor Trust of Advance Watch Company Ltd. ("Advance Watch" or "Company") brings this action against Defendants Marcello Binda and Simone Binda (collectively, "the Bindas" or "Defendants") for breach of fiduciary duties and common law commercial waste. Before the Court is Defendants' motion for summary judgment on the sole remaining claim of breach of fiduciary duties. For the reasons stated herein, the motion for summary judgment is hereby **GRANTED IN PART** and **DENIED IN PART**.

## I. FACTUAL BACKGROUND

      Unless stated otherwise, the facts are derived from the Parties' Local Civil Rule 56.1 Statements, declarations, and exhibits. Where the facts are subject to legitimate dispute, they are construed in favor of the non-moving party. *See Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005).

### A. Key Individuals and Entities

Advance Watch Company, Ltd. ("Advance Watch" or "Company") is a privately held Michigan corporation headquartered in New York. Defendants' Rule 56.1 Statement ¶ 1; Pl.'s Response to Defendants' Rule 56.1 Statement ¶ 1. GWG International, Ltd. ("GWGI") is a Delaware corporation that was wholly owned by Advance Watch. Defs.' Stmt. ¶ 3; Pl.'s Resp. to Defs.' Stmt. ¶ 3. Advance Watch, GWGI, and their affiliates operated under the name Geneva Watch Group ("GWG"), which "designed, assembled, marketed, and distributed" watches in the United States under exclusive licenses for different brands, including its own company brands. Defs.' Stmt. ¶ 2; Pl.'s Resp. to Defs.' Stmt. ¶ 2. For Advance Watch, Dolce & Gabbana, Betsey Johnson, Kenneth Cole and Tommy Bahama were among the main licensed brands. Simone Binda Declaration ¶ 11; Marcello Binda Declaration ¶ 5.

Defendants Marcello and Simone Binda were the owners and co-CEOs of Binda Italia Srl f/k/a Binda SpA S.R.L. ("Binda Italy"), an Italian company headquartered in Milan that manufactures and sells watches and accessories worldwide. Defs.' Stmt. ¶ 4; Pl.'s Resp. to Defs.' Stmt. ¶ 4. In 2008, to enter the U.S. market, Binda Italy formed Binda USA Holdings, Inc. ("Binda USA"), a Delaware corporation, which acquired Advance Watch from hedge fund D.E. Shaw Laminar Portfolios LLC. Defs.' Stmt. ¶ 5; Pl.'s Resp. to Defs.' Stmt. ¶ 5; S. Binda Decl. ¶ 8, 9. Upon the acquisition, Binda Italy became parent to Binda USA, which wholly owned Advance Watch. Defs.' Stmt. ¶ 6; Pl.'s Resp. to Defs.' Stmt. ¶ 6.

Advance Watch functioned as the operating company for GWG and shared the same directors and officers with Binda USA and GWGI. Defs.' Stmt. ¶ 7, 9; Pl.'s Resp. to Defs.' Stmt. ¶ 7, 9. As of July 31, 2012, the officers for Advance Watch, Binda USA, and GWGI (collectively, "Advance Watch and its affiliates") were Jeffrey L. Gregg as President, CEO, and Secretary, John Cuccurullo as CFO and Treasurer, and Nick Lancellotti as Vice President. Defs.'

Stmt. ¶ 9, 10; Pl.'s Resp. to Defs.' Stmt. ¶ 9, 10. Its directors were Simone Binda (as Board Chairman), Marcello Binda, and Gregg. *Id*. Simone Binda sat on the Board of Advance Watch from at least 2010 through 2015, and Marcello was a director from at least 2008 through 2015. Plaintiff's Rule 56.1 Statement ¶ 51, 53, 54; Defendants' Response to Plaintiff's Rule 56.1 Statement ¶ 51, 53, 54. Neither of the Bindas participated in Board meetings, but after preparation by an Advance Watch executive and review by outside counsel, they would review and sign documents. Pl.'s Stmt. ¶ 57, 67; Defs.' Resp. to Stmt. ¶ 57, 67. Marcello Binda was rarely involved in board meeting discussions or financial- or business-related matters. Pl.'s Stmt. ¶ 57, 67; Defs.' Resp. to Stmt. ¶ 57, 67. Gregg never had any discussions regarding financial or business matters with Marcello Binda. Pl.'s Stmt. ¶ 58, 60; Defs.' Resp. to Stmt. ¶ 58, 60.

## B. The Revolving Credit Facility

On July 31, 2008, Binda Italy entered into a Revolving Credit Agreement with Advance Watch whereby Binda Italy would provide working capital to Advance Watch, and Advance Watch would repay cash in return to Binda Italy (the "Revolving Credit Facility"). Defs.' Stmt. ¶ 12; Pl.'s Resp. to Defs.' Stmt. ¶ 12. The Revolving Credit Facility created a process by which Binda Italy could provide working capital to Advance Watch and its affiliates, and to repay cash to Binda Italy. Defs.' Stmt. ¶ 13; Pl.'s Resp. to Defs.' Stmt. ¶ 13. Whether lending and borrowing under the Revolving Credit Facility required approval of the Bindas, either in their capacities as CEOs or owners of Binda Italy or directors of Advance Watch, is disputed. Defs.' Stmt. ¶ 16-19; Pl.'s Resp. to Defs.' Stmt. ¶ 16-19; S. Binda Decl. ¶ 22; M. Binda Decl. ¶ 14. Binda Italy had other credit facilities with some of its subsidiaries. S. Binda Decl. ¶ 15; Marcello Binda Decl. ¶ 8. It is undisputed that Advance Watch typically repaid money to Binda Italy in December and would borrow the same amount the following January under the Revolving Credit

Facility. Defs.' Stmt. ¶ 16, 17; Pl.'s Resp. to Defs.' Stmt. ¶ 16, 17. From fiscal years 2009 to

2013, audited financials show that Advance Watch owed increasing balances between $21-$27

million under the Revolving Credit Facility. *See* Jason W. Burge Declaration, Exs. O, P.

### C. Prior to Closing the Wells Fargo Credit Agreement

In 2010, the Betsey Johnson license was terminated, which accounted for approximately

$8.1 million in annual revenue for Advance Watch and its affiliates. Steven M. Cordero, Ex. 13 ¶

28-33 (Bankruptcy Declaration ¶ 28-33). In 2013, the Dolce & Gabbana license expired,

resulting in a $25-30 million decline in annual revenue for Advance Watch and its affiliates. *Id*.

The loss of these licenses occurred before Advance Watch prepared its fiscal year 2014 budget.

Pl.'s Stmt. ¶ 76; Defs.' Resp. to Stmt. ¶ 76.

Gregg assumed that Advance Watch would receive approximately $10 million in

additional financing from a new and separate third-party line of credit, beyond the revolving

credit line with Binda Italy, to pay down accounts with vendors, and the company accounted for

the additional working capital in preparing its budget for fiscal year 2014. Pl.'s Stmt. ¶ 84; Defs.'

Resp. to Stmt. ¶ 84. Gregg testified that Advance Watch stretched several of its major vendors to

continue supplying goods in the hopes of using the supplemental liquidity to help relieve some of

the stress on vendors. Pl.'s Stmt. ¶ 83-84, 86; Defs.' Resp. to Stmt. ¶ 83-84, 86. He testified that

the "plan was to use some of the capital . . . to start to bring those vendors current over a period

of time." Gregg Depo. 42:14-16. When Gregg originally mentioned this plan to Simone Binda

and others at Binda Italy, there was no objection. Pl.'s Stmt. ¶ 90; Defs.' Resp. to Stmt. ¶ 90.

Whether Marcello Binda was ever informed of this business plan is in dispute. *Id*. According to

Gregg, Advance Watch operated on the assumption that none of the financing set aside for the

Company would be used to pay down the Revolving Credit Facility when preparing its budget

for 2014. Pl.'s Stmt. ¶ 87; Defs.' Resp. to Stmt. ¶ 87. Documents from independent auditor

Deloitte & Touche, LLP ("Deloitte") show projected positive gross profit from FY14 through

FY18. *See* Burge Decl., Ex. I. The workpapers further note that gross profit margins "are

expected to increase through FY18 due to [a] decrease in [Dolce & Gabbana] licensing fee[s]."[1]

*Id*. Gregg testified that the Board of Advance Watch adopted a resolution approving the 2014

budget. Gregg Depo. 45:3-5.

### D. Closing the Wells Fargo Credit Agreement

A few days prior to closing on the credit agreement that would provide the anticipated

$10 million in financing, Binda Italy CFO Mauro Valenti informed Gregg that Binda Italy was

calling on Advance Watch to make a $14,857,380 repayment to pay down the Revolving Credit

Facility, which both upset and surprised him.[2] Pl.'s Stmt. ¶ 91-92; Defs.' Resp. to Stmt. ¶ 91-92.

Gregg testified that Simone Binda and Valenti informed him that Binda Italy would require the

repayment. Gregg Depo. 102:17-103:16. Marcello never had any discussions with Gregg about

---

[1] As part of its independent audit, Deloitte opined that the "consolidated financial statements present fairly, in all material respects, the financial position of Binda USA and its subsidiaries as of March 30, 2013 and March 31, 2012." Defs.' Stmt. ¶ 23-24; Pl.'s Resp. to Defs.' Stmt. ¶ 23-24. They prepared a Going Concern Assumption Memorandum that stated as follows:

> Despite the fact that the Company incurred a net loss in the current year, we have concluded there is no substantial doubt regarding the Company's ability to continue as a going concern. The entity is a wholly-owned subsidiary of an Italian group, Binda Italia S.r.l. and management has asserted that its Parent would provide financing for working capital if needed. Additionally, the Company has strong projections for the next years, which appear to be achievable based on the Company's plan.

> We corroborated management's assertion regarding the financing by its Parent based on our knowledge that such funding is currently provided throughout the year through an intercompany loan between the Company and its Parent which Binda USA utilizes as a line of credit. On June 14, 2013, this loan was amended to extend the expiration date to December 31, 2018 . . . . Additionally, although not considered in our assessment of going concern and included herein for informational purposes only, we noted that the Company is in the process of obtaining a third party line of credit to further provide financing of their operations."

Cordero Decl., Ex. 7 at 5 (Deloitte Going Concern Assumption Memorandum).
[2] As of March 30, 2013, Advance Watch had not yet repaid $27,355,425, including interest, owed to Binda Italy under the Revolving Credit Facility. Defs.' Stmt. ¶ 20; Pl.'s Resp. to Defs.' Stmt. ¶ 20.

the Wells Fargo Credit Agreement and how to use its funds. Pl.'s Stmt. ¶ 57, 60; Defs.' Resp. to Stmt. ¶ 57, 60. Gregg acknowledged that the decision to spend $14.8 million of the Wells Fargo loan proceeds on the Revolving Credit Facility would not allow Advance Watch to honor its commitment to its vendors. Pl.'s Stmt. ¶ 94; Defs.' Resp. to Stmt. ¶ 94.

On June 21, 2013, Advance Watch and its affiliates, including subsidiaries,[3] entered into a credit agreement with Wells Fargo Bank, N.A. ("Wells Fargo"), which provided a $45 million asset-based line of credit ("Wells Fargo Credit Agreement"), and repaid $14,857,380 to Binda Italy through the Revolving Credit Facility (the "June 2013 Repayment"). Defs.' Stmt. ¶ 21, 28; Pl.'s Resp. to Defs.' Stmt. ¶ 21, 28. The Wells Fargo Credit Agreement permitted borrowers to use its proceeds (no more than $21.5 million) to make repayments on the outstanding balance under the Revolving Credit Facility. Defs.' Stmt. ¶ 30-31; Pl.'s Resp. to Defs.' Stmt. ¶ 30-31; Cordero Decl. Ex. 10. The Revolving Credit Facility was subordinated to the Wells Fargo loan ("Subordination Agreement") in conjunction with the Wells Fargo Credit Agreement. Defs.' Stmt. ¶ 31; Pl.'s Resp. to Defs.' Stmt. ¶ 31; Cordero Decl. Ex. 11. The Subordination Agreement acknowledged that the Wells Fargo credit would take priority over the revolving credit with Binda Italy. *Id*. The parties dispute whether the Bindas were personally responsible for the decision to re-direct the Wells Fargo funds from Advance Watch to the Revolving Credit Facility. Plaintiff claims that, as a result of the alleged breach, Advance Watch sustained damages totaling $27.613 million ($8.959 million in operating income generated, and $18.654 million in actual operating losses). Harold Asher Declaration ¶ 19-22.

### E. The Debtors' Bankruptcy

---

[3] Sunburst Products, Inc., and Advance Watch Company (Far East) Limited ("Far East").

In or about June 2015, over two years after the June 2013 Repayment, Binda Italy filed for bankruptcy in Italy and became incapable of providing working capital to Advance Watch and its affiliates any longer. S. Binda Decl. ¶ 32-33; Burge Decl., Ex. J at 16 (Bankruptcy Decl. at 16). Four months later, on September 30, 2015, Binda USA, GWGI, Advance Watch and Sunburst Products, Inc. (collectively, the "Debtors") filed for bankruptcy under Chapter 11 of the Bankruptcy Code (the "Bankruptcy"). Defs.' Stmt. ¶ 33; Pl.'s Resp. to Defs.' Stmt. ¶ 33. At the time of Bankruptcy, Advance Watch had an outstanding balance of approximately $26.2 million under the Revolving Credit Facility. Defs.' Stmt. ¶ 35; Pl.'s Resp. to Defs.' Stmt. ¶ 35. This balance exceeded the amount outstanding to Wells Fargo—approximately $13.3 million. Defs.' Stmt. ¶ 35; Pl.'s Resp. to Defs.' Stmt. ¶ 35. On August 2, 2016, U.S. Bankruptcy Judge Martin Glenn issued an order approving the settlement agreement, which included a general release to Binda Italy of any and all claims brought by Debtors, except for any claims the Debtors "had against any officer or director of the Debtors solely in their capacity as an officer or director of the Debtors." Defs.' Stmt. ¶ 45; Pl.'s Resp. to Defs.' Stmt. ¶ 45.

## II. PROCEDURAL BACKGROUND

On January 21, 2020, Magistrate Judge Sarah Netburn issued a Report and Recommendation ("R&R") denying in part and granting in part Defendants' motion to dismiss the First Amended Complaint. ECF No. 67. The R&R recommended, among other things, dismissal of Plaintiff's claims to the extent (i) they formed the basis of conduct occurring before September 29, 2009 or (ii) they arose from any breach of fiduciary duties owed to parties *other than* Advance Watch or GWGI. *Id.* at 38. It also recommended dismissal of the commercial waste claim as to all defendants. *Id.* This Court adopted the R&R in full on February 26, 2020.

ECF No. 69. Following discovery, on May 27, 2021 Defendants moved for summary judgment. ECF Nos. 96-102. Plaintiff opposed on June 29, 2021. ECF Nos. 103-107. On July 20, 2021, Defendants filed a reply. ECF Nos. 109. The Court deems this motion fully briefed. Upon review of the Parties' submissions, the Court finds that oral argument is not necessary. The Court will therefore exercise its discretion to decide this motion on the papers.

### III. STANDARD OF REVIEW

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). An issue is material if it would "affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* There is no issue of material fact where the facts are irrelevant to the disposition of the matter. *See Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F.Supp.2d 756, 761 (S.D.N.Y. 2013).

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor. *See Beechwood Restorative Care Ctr. v. Leeds,* 436 F.3d 147, 151 (2d Cir. 2006). Courts may not assess credibility, nor may they decide between conflicting versions of events, because those matters are reserved for the jury. *See Jeffreys v. City of New York,* 426 F.3d 549, 553–54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* (quoting *Anderson*, 477 U.S. at 252).

# IV. DISCUSSION

## A. Local Rule 56.1 Statements

Defendants advance objections to Plaintiff's Rule 56.1 Statement for failure to cite to record evidence, referencing the expert opinion of Michael Goldman, and quoting documentary evidence as undisputed material fact. The Court will address each in turn.

Local Civil Rule 56.1 requires that "[e]ach statement by the movant or opponent . . . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Local Civ. R. 56.1(d). Under Rule 56(c)(4) of the Federal Rules of Civil Procedure, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "If a party fails to properly support an assertion of fact . . . as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Fed. R. Civ. P. 56(e). Courts may exercise discretion to disregard any improper assertions in the parties' Rule 56.1 statements. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001).

### 1. Record Citations Generally

Defendants object to portions of Plaintiff's Response to Defendants' Rule 56.1 Statement for failure to cite to record evidence. The Court agrees that there are several instances where

Plaintiff denies Defendants' factual assertions but fails to provide any citation to the record for support, as required by Local Rule 56.1(d). *See, e.g.*, Pl.'s Resp. to Defs.' Stmt. ¶ 17, 19, 38. For purposes of deciding the instant motion, the Court will not consider any denials in Plaintiff's response that fail to provide supporting record evidence. Where Plaintiff has failed to support its denial and Defendants' factual averments are supported by citations to admissible evidence, the Court will accept them as true and undisputed. *Holtz*, 258 F.3d at 73 (2d Cir. 2001). Courts may disregard impermissible portions of Rule 56.1 statements. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F.Supp.3d 352, 397 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019).

### 2. Expert Declaration of Michael Goldman

Defendants also object to portions of Plaintiff's Rule 56.1 Statement that cite excerpts of expert opinion as undisputed material fact. Plaintiff retained Michael Goldman to provide an opinion as to whether the June 2013 Repayment, "instead of being used to catch up with past due vendors," caused Advance Watch to "remain[] in its vicious cycle of cash shortages, leading to product shortages, leading to lost sales and lower collateral values, which further exacerbated the cash shortages." Michael Goldman Declaration ¶ 17. The challenged portions of Plaintiff's Rule 56.1 Statement assert that:

> 97.    Advance Watch competitor Fossil did not recognize the competitive threat  of wearables and new technology as identified risk factors in its 2012 and 2013 annual reports. The first mention of wearable technology as a risk to the traditional watch business was in Fossil's 2014 annual report. Fossil's 2015 annual report mentioned new technologies, but in the context of them being a threat to the technology that Fossil was attempting to develop. (Goldman Decl. at ¶31(a)(i)).

> 98.    Movado, another Advance Watch competitor, recognized in its 2014 annual report that on-line retail was a competitive threat, but it did not recognize a competitive threat from wearable technology or smart phones. Movado first

mentions competition from "those selling smart watches and other smart wearables" in its 2015 annual report. (Goldman Decl. at ¶31(a)(ii)).

99.    Swatch, another Advance Watch competitor, mentioned in its 2014 annual report currency exchange rate fluctuation as one of its significant risks, but did not mention wearables or smart phones. (Goldman Decl. at ¶31(a)(iii)).

100.    Fossil's 2012 Form 10-K stated:

a.    We believe watch sales across all of our operating segments benefited from a resurgence in the watch category in general, resulting in consumers allocating more of their discretionary spending to this fashion category.

b.    Net sales in the North America wholesale segment rose 24.1%, or $187.4 million, during fiscal year 2011, including double-digit sales growth across all major product categories. Watch sales increased 29.5%, or $162.7 million, representing broad-based growth across brands.

c.    Net sales in the North America wholesale segment increased 12.2%, or $118.2 million, during fiscual year 2012. This sales growth was primarily attributable to a 17.7%, or $127.2 million, increase in watch sales. (Goldman Decl. at ¶34(a)).

101.    Fossil's 2013 Form 10-K stated:

a.    Net sales in the North America wholesale segment increased $133.1 million or 12.3% during fiscal year 2013, representing growth across the U.S., Canada and Latin America. Watch sales led the growth, increasing $142.3 million or 16.9%. (Goldman Decl. at ¶34(b)).

102.    Fossil's 2014 Form 10-K stated:

a.    The department store channel has been challenging due to the continuing promotional retail environment and due to retail partners managing to lower inventory levels. In contrast currency, both the jewelry and watch categories contributed favorably to fiscal year 2014, as jewelry sales increased $16.5 million or 33.2% and watches increased $16.4 million or 1.7% [in North America]; and

b.    Global watch sales made the most significant contribution, increasing $223.4 million or 8.9%, in fiscal year 2014. (Goldman Decl. at ¶34(c)).

103.    Swatch's 2014 Annual Report stated:

a.    With regard to our results in 2014: once again this year, we achieved a record turnover [sales]- which is in itself an achievement in the current

difficult climate . . . . Given the good results in 2014 and the prospects that we consider positive for 2015. (Goldman Decl. at ¶34(d)).

104.    Swatch's 2015 Annual Report blamed sales decreases in watches on infectious diseases (MERS) and the strong impact that that had on tourism destinations. It did not mention smart phones or wearables. (Goldman Decl. at ¶34(e)).

105.    Movado's 2016 Form 10-K stated that net sales in fiscal 2016 in the United States location of the Wholesale segment were $261.3 million, above the prior year period by $5.6 million or 2.2%, primarily driven by sales increases in the luxury brands category. It did not discuss smart phones and wearables as a factor impacting sales. (Goldman Decl. at ¶34(f)).

106.    Fossil's 2016 Form 10-K stated that we believe that a number of consumers regard branded fashion watches not only as timepieces, but also as fashion accessories, and that has historically resulted in consumers owning multiple watches that may differ significantly in terms of style, features and cost. (Goldman Decl. at ¶34(g)).

107.    In fact, the first Apple Watch was launched in April 2015. (Goldman Decl. at ¶37).

108.    In its 2015 Form 10-K, Movado discussed the factors that most impact watch sales. It did not mention competition from smart phones or wearables, nor did it mention the importance of branding:

        a.    The primary factors that influence annual sales are general economic conditions in the Company's U.S. and international markets, new product introductions, the level and effectiveness of advertising and marketing expenditures and product pricing decisions. (Goldman Decl. at ¶38).

109.    As part of its audit of Advance Watch's 2013 financial statements, Deloitte found the following projections to be "reasonable" (Burge Decl. Ex. I, Deloitte Workpapers from March 2013 audit containing Binda USA Holdings, Inc. projections; Goldman Decl. at ¶44):

        a.    4.0% sales growth in FY 2014;

        b.    7.8% sales growth in FY 2015;

        c.    6.7% sales growth in FY 2016; and

        d.    4.5% sales growth in both FY 2017 and FY 2018.

Pl.'s Stmt ¶ 97-109.

Citing expert opinion as undisputed fact in this manner is improper. After all, Mr. Goldman is providing an opinion to persuade the ultimate trier-of-fact of his position and to rebut testimony from defense expert Steven Haas about the cause of Advance Watch's losses. His opinions are "no substitute for proof of an underlying fact." *In re Refco Inc. Sec. Litig.*, Nos. 07-MD-1902 (JSR), 08-CV-3065 (JSR), 08-CV-3086 (JSR), 2013 WL 12191891, at *7 (S.D.N.Y. Mar. 11, 2013). The Court therefore declines to treat these statements as undisputed facts. Courts may decline to consider improper assertions in Rule 56.1 Statements.[4] *See Holtz,* 258 F.3d at 73-74.

### 3. Documentary Evidence

---

[4] Defendants also contend that specific portions of Mr. Goldman's testimony rely on hearsay documents of which he has no personal knowledge. Defs.' Resp. to Stmt. ¶ 97-109. At summary judgment, a district court may screen for inadmissible expert testimony. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (citations omitted). Defendants ask that the Court throw out these portions of his testimony. The Court declines to do so.

Federal Rule of Evidence 703 permits experts "to testify to opinions based on inadmissible evidence, including hearsay, if 'experts in the field reasonably rely on such evidence in forming their opinions.'" *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citations omitted). "The expert may not, however, simply transmit that hearsay to the jury." *Id.* (citation omitted). "Instead, the expert must form his own opinions by 'applying his extensive experience and a reliable methodology' to the inadmissible materials." *Id.* (citation omitted). District courts must only exclude expert testimony where "it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009). Expert opinion is often admissible if it is "likely to substantially assist the average person in understanding the case—even if it simply explains facts and evidence already in the record." *In re Zyprexa Prods. Liab. Litig.*, 489 F.Supp.2d 230, 282 (E.D.N.Y. June 11, 2007).

In his rebuttal to defense expert Steven Haas' opinion, Goldman presents contemporaneous evidence to refute Haas' opinion that during the period in dispute, Advance Watch was "doomed" by market disruptions in the watch market. In particular, he references Form 10-Ks for the relevant timeframe of some of Advance Watch's competitors, including Fossil, Movado, and Swatch, to point out what he believes to be errors and inaccuracies in Mr. Haas opinion. Considering the liberal standard of Rule 703, that Goldman offers testimony regarding the causes of Advance Watch's business failure, and that his testimony is not "speculative or conjectural" or "so unrealistic and contradictory as to suggest bad faith," the Court sees no reason to exclude portions of his testimony based on his use of Form 10-Ks at this stage. *See Zerega Ave.*, 571 F.3d at 213-14.

Defendants' objection to projected sales growth numbers at Paragraph 44 of Mr. Goldman's declaration is unavailing. He appears to calculate projected sales growth from FY 2014 through FY 2018 based upon the evidence. Defendants provide no reason why his calculations would be "speculative," "conjectural," or otherwise "suggest bad faith." *See Zerega Ave.*, 571 F.3d at 213-14.

Defendants also ask the Court to disregard several factual allegations in Plaintiff's Rule 56.1 Statement that cite to four email documents attached to the Declaration of John W. Burge. They lodge hearsay objections to the evidence cited in support of the following purportedly undisputed facts from Plaintiff's Rule 56.1 Statement:

> 114.    In a January 6, 2014, email, from Tony Tam of Advance Watch Far East to Alberto Elli, et al., Mr. Tam stated that "many vendors are calling for payments and they are worry about us not able to pay." Burge Decl. Ex. K.

> 115.    In a January 8, 2014, email from Mr. Tam to Alberto Elli, et al., Mr. Tam stated "Please let us know the exact amount of cash available as soon as possible.  It is important that we communicate to vendors about the payment plan instead of just asking them to wait, communication to vendors is the key to comfort them and to maintain good relationship when there is no cash." Burge Decl. Ex. L.

> 116.    In a June 10, 2014, email from Alberto Elli to Marco Forzani and Mauro Valenti, Mr. Elli stated "Marco, as we planned four weeks ago in our cash forecast, this week is most problematic. … Otherwise, we do not have enough cash flow to wire to FE…" Burge Decl. Ex. M.

> 117.    In a September 13, 2014, email from Kevin Hall, then CEO of Advance Watch, to Marco Forzani, et al., Mr. Hall stated:

> Our expected orders are already below budget and year ago.

> Our production has been producing below plan all year due to vendor issues. But we were supposed to be caught up and on plan by now after the investor money was injected.

> We have missed Sales each month due to these issues.

> Now I hear that we should expect continued misses in our production plans as we head into Holiday due to cash constraints..... but we are not sure where and when to expect these misses?? Other than clocks which seems to be everyone's favorite miss.

> We can't run a business or build a budget to that.

> We need a plan and budget based on a production flow that we can count on. And that you and the organization can commit to.

Sales is pulling back orders right now as they don't trust production. This is just going to keep compounding across the business.

The more we miss, the less cash we will have.

Chasing down orders only to find out we won't have product on time is not working. Frustrating us all.

Our efforts are misplaced thinking we can determine our financial future based on getting more retail orders. We already have more orders than we can service. Let's quit wasting all of the energy chasing orders.

Walmart is in the budget at $4.25 this month. They will take everything we can get in. I am hearing we can only do $3?

Macys wants $1million and can only get $400k?

Clocks has over $6 million in orders and growing but there is not a clear plan on product we can expect ? Killing this is killing $6 Million in the forecast.

List goes on.

And everyone is panicking over their Holiday builds. Growing rumors of delays.

Let me be clear . . . . If we have delays in Holiday we hit a window where we don't want that product past a certain timeline. Delays past the window misses the consumption and drives up inventory risk.

We need truth here fast on these builds. If the rumors are true, we may have to institute "kill switches" where we kill a program In time to avoid inventory build.

Nobody wants a repeat of last year.

But yes . . . Killing programs is bad for our cash, our profit position and just as importantly our reputation. This would kill us for next year.

I would rather get our arms around it now though than in a few months when we would have all of the above issues plus growing inventory that has no home as it is here too late.

We are finishing our traditional budgeting process this weekend where we project the business based on expected retail orders and the assumption that we can service that business.

But if we can't deliver that plan as we will only have 70-80% of the product, then it is a bad plan and budget.

On Cash, I keep hearing not enough cash. Not enough cash. But then Alberto shows me that our cash is ahead of plan. We need a better plan than "not enough".

PS. I want to repeat . . . . We will not be accepting or paying for product that arrives too late into Holiday to ship. We think we have vendor issues now . . . . (Burge Decl. Ex. N).

Pl.'s Stmt. 114-117.

The factual statements appear to be hearsay and, to the extent they are, should be excluded from consideration on summary judgment. "Hearsay is any out-of-court statement offered to prove the truth of the matter asserted in the statement." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (citing Fed. R. Evid. 801(c)). Rule 802 provides that hearsay is inadmissible unless made admissible by a federal statute, the Federal Rules of Evidence, or other rules prescribed by the U.S. Supreme Court. *Id.* Here, Plaintiff lifts direct quotes from the emails and cites them as undisputed fact in his Rule 56.1 Statement, leaving no doubt that they are offered to prove the truth of the matters asserted in them. He intends to rely on this evidence to show that, upon the June 2013 Repayment, Advance Watch faced more urgent cash shortages and thus struggled to pay its vendors. Pl.'s Opp. Mem. at 11 ("Internal emails document that Advance Watch was cash starved and unable to pay its vendors."); *id.* at 25 ("Contemporaneous emails show the Company was experiencing trouble due to cash shortages at that time."); *id*. at 26 ("The contemporaneous emails from Advance Watch's then-CEO (Kevin Hall) and others confirm that Advance Watch's inability to pay vendors harmed its ability to obtain needed product for sale."). But inadmissible hearsay evidence is "insufficient to create a genuine issue for trial." *Patterson v. City of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).[5]

---

[5] Defendants also object to this documentary evidence on authentication grounds, but the Court need not reach this question.

## B. New Claim Asserted in Opposition to Summary Judgment

The Court will next address Defendants' contention that Plaintiff, for the first time in opposition to summary judgment, has asserted a new claim. Defs.' Reply Mem. at 7-9. On the current record, the Court declines to exercise its discretion to permit this new claim against Defendants at this late stage in a four-year litigation.[6]

There is no doubt that Plaintiff has impermissibly asserted this new claim for the first time in opposition to summary judgment. First and foremost, at no point since the close of fact discovery—over a year ago—does it appear that Plaintiff submitted written consent from Defendants or sought leave of court to amend the FAC in this manner. Fed. R. Civ. P. 15(a)(2) ("[A] party may amend its pleading only with the opposing party's written consent or the court's leave."). And "[a] party may not use his or her opposition to a dispositive motion as a means to amend the complaint." *Shah v. Helen Hayes Hosp.*, 252 Fed.Appx. 364, 366 (2d Cir. 2007) (summary order); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998); *see also Brandon v. City of New York*, 705 F.Supp.2d 261, 278 (S.D.N.Y. 2010) (citing cases) ("It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment."). Accordingly, the Court will not permit this new claim.[7] *See Thomas v. Egan*, 1

---

[6] It appears that Plaintiff has impermissibly asserted a new claim in opposition to summary judgment. As made clear by the First Amended Complaint (FAC) and the progression of this litigation to date, the gravamen of the claim is for a breach of the duty of loyalty and good faith based upon actions taken by Defendants. Plaintiff in large part alleges that Defendants' use of their positions as directors to engage in self-interested transactions, against the best interests of the Company, that ultimately led to Advance Watch's demise. FAC ¶ 55-62. For example, the FAC avers that Defendants "caused Advance Watch to funnel cash upstream to and for the benefit of Binda Italy," (¶ 55) and caused "Advance Watch, GWG, and Sunburst to make payments to and provide other benefit[s] to Binda Italy which were adverse to both the interests of Advance Watch and the other corporations and their respective creditors . . . repetitively protect[ing] the interests of Binda Italy at the expense of Advance Watch, GWG, and Sunburst." (¶ 59). Finally, in concluding its allegations in connection with this count, Plaintiff alleges that "Defendants' *actions* harmed Advance Watch in an amount to be proven at trial." FAC ¶ 62 (emphasis added). Though Plaintiff may use the magic phrase "duty of care" once in the entire FAC, as actually pleaded[s] to the original complaint and the FAC, it is merely an afterthought. Nowhere in the FAC does Plaintiff plead breach of the fiduciary duty of care or a similar claim against Defendants.

[7] To add, the Court declines to allow Plaintiff to add a new claim due to the inordinate delay and likely prejudice to Defendants. Fact discovery closed on December 4, 2020, (ECF No. 81) and Plaintiff did not assert this new claim

Fed.Appx. 52, 54 (2d Cir. 2001) (summary order) (citations omitted) ("A claim must be set forth in the pleadings, in order to give defendants fair notice of the nature of the plaintiff's claim.").

### C. Summary Judgment Should Be Granted in Favor of Marcello Binda Only

The Court now turns to whether Defendants are entitled to summary judgment as a matter of law on the fiduciary duty claim alleging that the Bindas approved the June 2013 Repayment against the best interests of the Company and ultimately caused operational and profit losses to Advance Watch and its affiliates. The Court concludes that Plaintiff lacks substantial evidence to prove that (i) Marcello Binda breached fiduciary duties to Advance Watch and (ii) that, even if Simone Binda potentially breached fiduciary duties, he would have caused operational and profit losses to Advance Watch.

### 1. Elements of a Breach of Fiduciary Duty Claim under Michigan Law

"A claim of breach of fiduciary duty 'sounds in tort.'" *Highfield Beach at Lake Michigan v. Sanderson*, 331 Mich. App. 636, 666, 954 N.W.2d 231, 247 (2020) (citation omitted). "To establish a claim for breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages caused by the breach of duty." *Id.* (citations and footnote omitted). "The elements of an action for damages arising out of a tortious injury include: (1) a legal duty, (2) a breach of the duty, (3) a causal relationship, and (4) damages." *Lumley v. Bd. of Regents for Univ. of Mich.*, 215 Mich. App. 125, 130, 544 N.W.2d

---

until almost seven months later and after Defendants moved for summary judgment. Even further, well over four years have passed since the filing of the original complaint. With no explanation for its undue delay and no showing that such delay would not have a prejudicial effect on Defendants at this late stage, the Court is not prepared to grant Plaintiff leave to amend its complaint for a second time. Indeed, unfair prejudice is a sufficient ground in this Circuit for denying leave to amend. *See, e.g., Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008); *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71 (2d Cir. 1998), *cert. denied*, 525 U.S. 1041, 119 S. Ct. 592, 142 L. Ed. 2d 534 (1998); *Ansam Associates, Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442 (2d Cir. 1985). Courts in the Second Circuit also deny leave to amend where the moving party is guilty of undue delay, particularly after the close of discovery and defendant has moved for summary judgment. *See, e.g., McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184 (2d Cir. 2007); *Park B. Smith, Inc. v. CHF Industries Inc.*, 811 F.Supp.2d 766 (S.D.N.Y. July 12, 2011).

692 (1996). In Michigan, proof of damages is required for any tort claim. *Trudel v. City of Allen Park*, No. 332661, 2018 WL 1176638, at *4 (Mich. Ct. App. Mar. 6, 2018); *Adell v. Schafer*, No. 264730, 2006 WL 475286, at *3 (Mich. Ct. App. Feb. 28, 2006) ("plaintiff must establish that he was injured as a result of the alleged breach" of fiduciary duty) (citation omitted)).

### 2. As Advance Watch Directors, Both Simone and Marcello Binda Owed Fiduciary Duties to the Company

Under Michigan law, "a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another." *Petroleum Enhancer, LLC v. Woodward,* 690 F.3d 757, 765–66 (6th Cir. 2012) (quoting *Teadt v. Lutheran Church Mo. Synod,* 237 Mich.App. 567, 603 N.W.2d 816, 823 (1999)). "It is beyond dispute that in Michigan, directors and officers of corporations are fiduciaries who owe a strict duty of good faith to the corporation which they serve." *Petroleum Enhancer*, 690 F.3d at 765–66 (quoting *Prod. Finishing Corp. v. Shields,* 158 Mich.App. 479, 405 N.W.2d 171, 174 (1987)); *see also* M.C.L. § 450.1541a(1) ("A director or officer . . . shall discharge his or her duties as a director or officer . . . [i]n good faith."). "[W]here the fiduciary obligation of corporate officers and directors ends and the personal right of independent action begins in ordinary business dealings may be difficult to determine, and no hard and fast rule of demarcation can be laid down. *Petroleum Enhancer*, 690 F.3d at 765-66 (citation omitted).

There is undisputed evidence that the Bindas owed a fiduciary duty to Advance Watch in their individual capacities as directors of Advance Watch. Both Marcello and Simone Binda sat on the Board of Advance Watch from at least 2010 through 2015, so a fiduciary relationship existed at least during that time.[8] Pl.'s Stmt. ¶ 51, 53-54; Defs.' Resp. to Pl.'s Stmt. ¶ 51, 53-54.

---

[8] Marcello Binda became a director in 2008.

Plaintiff suggests that Defendants also owe a fiduciary duty in their capacities as directors, officers, or owners of Binda Italy as the parent company to Advance Watch. However, no duty is owed in this capacity because it is undisputed that any claim or cause of action by Advance Watch against Binda Italy is barred by the Settlement Agreement from the Bankruptcy.[9] Defs.' Stmt. ¶ 45; Pl.'s Resp. to Defs.' Stmt. ¶ 45.

### 3. Only Simone Binda Potentially Breached Fiduciary Duties Owed to the Company

The Court now turns to whether the Bindas, in their individual capacities as directors of Advance Watch, breached the duty of loyalty and good faith to Advance Watch. Plaintiff claims that the Bindas breached by redirecting the June 2013 Repayment to Binda Italy, through the Revolving Credit Facility and with funds from the Wells Fargo Credit Agreement, against the best interests of Advance Watch. Defendants argue that Plaintiff has provided insufficient proof because the Bindas were not personally responsible for the June 2013 Repayment and, even if they were, the decision is shielded by the business judgment rule.[10] The Court concludes that Plaintiff has proffered sufficient evidence to create genuine factual disputes as to whether Simone Binda breached fiduciary duties of loyalty and good faith to Advance Watch.

---

[9] It is undisputed that, at all relevant times, the Bindas were co-CEOs and co-owners of Binda Italy. Defs.' Stmt. ¶ 4; Pl.'s Resp. to Defs.' Stmt. ¶ 4. The Settlement Agreement approved by U.S. Bankruptcy Judge Martin Glenn generally releases Binda Italy from "any claims, actions, causes of action, setoffs, and defenses," but it expressly and unambiguously excludes from release "any claims, actions, causes of action, setoffs, and defenses" from Debtors, which includes Advance Watch. But the Settlement Agreement reserves "any claims, actions, causes of action, setoffs, and defenses, of any kind or nature whatsoever, in law, equity, or otherwise . . . against any present or former officer and/or director of the Debtors . . . solely with respect to and in connection with any acts or omissions in their capacity as an officer and/or director of the Debtors." Cordero Decl., Ex. 13 at 5-6 (Bankruptcy Decl. at 5-6). Plaintiff also fails to contest, and therefore concedes, Defendants' contention that the undisputed and clear settlement terms bar Plaintiff from asserting any claim or cause of action against Defendants in their capacities as owners, directors, or officers of Binda Italy.

[10] Defendants also argue that Plaintiff has produced no evidence that the Bindas breached their fiduciary duty by ordering approximately $30 million worth of inventory with Advance Watch Far East. They cited testimony from the Bindas indicating that they did not cause Advance Watch to place these orders. Plaintiff's opposition ignores and, therefore, concedes this argument. Because Plaintiff has cited no evidence to support a denial of the Bindas' testimony and failed to seize its opportunity to do so, the Court will consider this fact undisputed. Defs.' Stmt. ¶ 42; Pl.'s Resp. to Defs.' Stmt. ¶ 42.

In Michigan, a fiduciary "has a duty to act for the benefit of the principal regarding matters within the scope of the relationship." *Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 766 (6th Cir. 2012) (quoting *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.,* 266 Mich.App. 39, 698 N.W.2d 900, 906 (2005) (per curiam)). He must "'subordinat[e] [his] personal interests to that of the other person.'" *Petroleum*, 690 F.3d at 766 (quoting *Wallad v. Access BIDCO, Inc.*, 236 Mich.App. 303, 600 N.W.2d 664, 666 (1999) (per curiam) (emphasis omitted)). "It is beyond dispute that in Michigan, directors and officers of corporations are fiduciaries who owe a strict duty of good faith to the corporation which they serve." *Prod. Finishing Corp.*, 158 Mich. App. at 485, 405 N.W.2d at 174. Michigan law also recognizes that officers and directors owe a duty of loyalty to corporations. *See* M.C.L. § 450.1541(a)(1) (codifying the common law rule). Furthermore, "[i]t is widely recognized that the appropriation of a corporate opportunity by an officer or director will constitute an actionable breach of fiduciary duties." *Prod. Finishing Corp.*, 158 Mich. App. at 485, 405 N.W.2d at 174 (1987). A director or officer must not "divert a corporate business opportunity for his own personal gain." *Id.* (quoting secondary sources). "[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake which is, from its nature, in the line of the corporation's business and is of practical advantage to it, and which is one in which the corporation has an interest or a reasonable expectancy, and if, by embracing the opportunity the self interest of the officer or director will be brought into conflict with that of this corporation, the law will not permit him to seize the opportunity for himself." *Id.* (same).

### a. No Material Issue of Fact Exists as to Whether Marcello Binda Breached Fiduciary Duties to Advance Watch

Plaintiff has not adduced evidence to establish a genuine issue as to whether Marcello Binda, in his capacity as Advance Watch director, approved the $14.8 million repayment to

Binda Italy against the best interests of the Company. It is undisputed that Marcello Binda never participated in any Board meetings, and that he generally played no "operative role" in Advance Watch. Pl.'s Stmt. ¶ 56-57, 59; Defs.' Resp. to Pl.'s Stmt. ¶ 56-57, 59. Gregg, both CFO and the only other director of Advance Watch alongside the Bindas, testified that he never had any discussions with Marcello Binda about the Wells Fargo Credit Agreement, the use of its funds, or any other financial or business matters. Pl.'s Stmt. ¶ 58, 60; Defs.' Resp. to Pl.'s Stmt. ¶ 58, 60. When asked, Marcello Binda did not recall having ever seen or reviewed any audited financial statements for Advance Watch, and had no recollection with regard to the use of Wells Fargo funds. Pl.'s Stmt. ¶ 63, 65; Defs.' Resp. to Pl.'s Stmt. ¶ 63, 65. Moreover, Marcello Binda did not recall some major business decisions that occurred at Advance Watch during his tenure as director. For example, he did not remember whether he was director of GWGI, a wholly owned subsidiary of Advance Watch, which was acquired during his Board tenure. *See* M. Binda Depo. 24:13. Though Plaintiff contends that Marcello Binda's testimony that he did not approve the June 2013 Repayment is self-serving, Plaintiff is unable to proffer any contrary evidence to create an issue of fact in this regard. There is no evidence that Marcello Binda acted in bad faith in connection with the June 2013 Repayment. Because the record offers no evidence that could lead a reasonable jury to find that he acted in bad faith or breach a duty of loyalty to Advance Watch, Defendant Marcello Binda is entitled to summary judgment as a matter of law regarding this claim.[11]

### b. Material Issues of Fact Exist as to Whether Simone Binda Breached Fiduciary Duties to Advance Watch

---

[11] To the extent Plaintiff intends to pursue a claim for breach of fiduciary duty against Marcello Binda on behalf of GWGI, that claim cannot survive summary judgment because he cannot prove that Marcello Binda breached. Under Delaware law, a plaintiff must prove "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).

Regarding Simone Binda, however, material issues of fact exist as to whether he approved or otherwise made the decision to divert the $14.8 million repayment to Binda Italy to pay down the outstanding balance on the Revolving Credit Facility. For instance, Gregg testified that he may have had conversations with Simone Binda about the choice to divert the $14.8 million payment to Binda Italy. Burge Decl., Ex. 105-1 at 12-13; Gregg Depo. Tr. 31:22-25, 32:1-5. He stated that he felt "surprise[d]" and "disappointed" by the decision, which he heard of approximately three days before the closing, because commitments were made to several "major vendors" that at closing Advance Watch would get more current on payments owed to them. Burge Decl., Ex. 105-1 at 13, 25; Gregg Depo. Tr. 32:6-23, 102:17-21. Gregg further testified that the effect of the decision "presented a frustration" because he had to find a new way to deal with th[e] situation." Burge Decl., Ex. 105-1 at 18; Gregg Depo. Tr. 41:15-16. He also explained that, prior to closing the Wells Fargo Credit Agreement, Simone Binda participated in in-person and telephonic discussions with Wells Fargo. Burge Decl., Ex. 105-1 at 23, 25; Gregg Depo. Tr. 76:4-9, 102:5-16. As discussed *supra*, Plaintiff has provided no evidence that Marcello Binda personally approved the June 2013 Repayment.

Construing the evidence in the light most favorable to Plaintiff, a reasonable trier-of-fact could infer that Marcello Binda and Gregg did not approve the decision to redirect the Wells Fargo funds, and that Simone Binda, as the only other director of Advance Watch at the time and its Board Chairman, approved the June 2013 Repayment. At that time, Simone Binda was co-CEO and co-owner of Binda Italy. Though Defendants cite what they believe to be contrary testimony, at the summary judgment stage, the court "may not assess [the] credibility" of testimony "because those matters are reserved for a jury." *Jeffreys*, 426 F.3d at 553-54. "[W]eighing the evidence is a task within the jury's function." *Brisboy v. Fibreboard Corp.*, 429

Mich. 540, 550, 418 N.W.2d 650, 654 (1988) (quoting *Caldwell v. Fox*, 394 Mich. 401, 231

N.W.2d 46 (1975)). A reasonable juror could conclude that his approval of the June 2013

Repayment was for personal gain—to benefit Binda Italy at the expense of Advance Watch.

Thus, there is more than "[t]he mere existence of a scintilla of evidence" to reasonably prove that

at least Simone Binda breached his fiduciary duties to Advance Watch. *Jeffreys*, 426 F.3d at 553-

54 (quoting *Anderson*, 477 U.S. at 252).

The business judgment rule does not preclude the claim for fiduciary breach against

Simone Binda. "Under the business-judgment rule, courts refrain from interfering in matters of

business judgment and discretion unless the directors or officers 'are guilty of willful abuse of

their discretionary powers' or act in bad faith." *Franks v. Franks*, 330 Mich. App. 69, 100, 944

N.W.2d 388, 404 (2019) (quoting *Reed v. Burton*, 344 Mich. 126, 131, 73 N.W.2d 333 (1955)

(quotation marks and citation omitted)). In other words, the presumption "can be rebutted if the

plaintiff shows that the directors breached their fiduciary duty of care or of loyalty or acted in

bad faith." *Adelman v. Compuware Corp.*, No. 333209, 2017 WL 6389899, at *1 (Mich. Ct.

App. Dec. 14, 2017) (quoting *F5 Capital v. Pappas*, 856 F.3d 61, 87 (2nd Cir. 2017), *appeal

denied*, 917 N.W.2d 374 (Mich. 2018); *see also In re Estate of Butterfield,* 418 Mich. 241, 341

N.W.2d 453, 458 (1983) ("In the absence of bad faith or fraud, a court should not substitute its

judgment for that of corporate directors."). Because Plaintiff could potentially prove to a

reasonable jury that Simone Binda breached fiduciary duties, the business judgment rule does not

apply.[12] Under Michigan law, "[s]uch proof[] must be offered before judicial interference with

_____

[12] Defendants attempt to provide business justification for the June 2013 Repayment to presumably demonstrate the
fairness of the interested transaction. Def.'s Mem. at 19-22. In Michigan, an interested director or officer "shall
not . . . be enjoined, set aside, or give rise to an award of damages or other sanctions" if "[t]he transaction was fair to
the corporation at the time entered into." M.C.L. 450.1545a(1)(a)-(b). However, the parties have set forth conflicting
evidence about the fairness of the transaction. Such factual disputes preclude summary judgment. *See, e.g.*, *Billstein
v. Goodman*, No. 08-13415, 2011 WL 13161321, at *10 (E.D. Mich. June 14, 2011) (denying summary judgment

the business judgment of corporate directors would be justified." *Butterfield*, 418 Mich. at 263, 341 N.W.2d at 462.[13]

### 4. There Are No Material Issues of Fact as to Whether Simone Binda's Alleged Breach Caused Advance Watch's Losses

On the record before the Court, Plaintiff cannot reasonably establish that the alleged breach caused Advance Watch's damages under Michigan law. His causation theory posits that the June 2013 Repayment deviated from the initial business plan to obtain financing from Wells Fargo to pay down overdue vendor accounts, and the resulting cash shortages led to operating and profit losses in subsequent years. Drawing all inferences in Plaintiff's favor, the record fails to demonstrate that but for the June 2013 Repayment, the alleged damages would not have otherwise occurred.

"To demonstrate proximate cause, a party must establish both cause in fact and legal cause." *Petroleum Enhancer*, 690 F.3d at 574 (applying Michigan law) (quoting *Alar v. Mercy Mem'l Hosp.*, 208 Mich.App. 518, 529 N.W.2d 318, 323 (1995)). "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Id.* (quoting *Skinner v. Square D Co.,* 445 Mich. 153, 516 N.W.2d 475, 479 (1994)). "Although [factual] causation cannot be established by mere speculation . . . a plaintiff's evidence of causation is sufficient at the summary disposition stage to create a question of fact for the jury 'if it establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support. *Patrick v. Turkelson*, 322 Mich. App. 595, 617, 913 N.W.2d 369, 383 (2018) (citation omitted)

---

because "[t]here are questions of fact remaining as to . . . whether the interested transactions were fair to the corporation.")

[13] Under Delaware law, there is sufficient evidence to prove that Simone Binda breached fiduciary duties toward GWGI as there are only two requisite elements: "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research*, 8 A.3d at 601.

(quoting *Wilson v. Alpena Co. Rd. Comm.*, 263 Mich.App. 141, 150, 687 N.W.2d 380 (2004)).
"When a number of factors contribute to produce an injury, one actor's [breach] will not be
considered a proximate cause of the harm unless it was a substantial factor in producing the
injury." *Brisboy*, 429 Mich. at 547, 418 N.W.2d at 653 (collecting cases and citing 2 Restatement
Torts, 2d). "Of all the elements necessary to support recovery in a tort action, causation is the
most susceptible to summary determination." *Davis v. Thornton*, 384 Mich. 138, 180 N.W.2d 11,
15 (1970).

The Sixth Circuit decision in *Petroleum Enhancer* is particularly instructive. Polar
Holding, parent of wholly owned subsidiary Polar Molecular, brought a claim for breach of
fiduciary duty against its former director Richard Socia. *See Petroleum Enhancer*, 690 F.3d at
573. While in dire financial straits, heavily in debt, in default on a secured loan, and mired in
hostile conflict with the rest of the Polar Holding board, Socia formed a separate company called
Petroleum Enhancer, LLC as part of a scheme with the lender of the defaulted loan to acquire an
interest in the promissory note and collateral attached to the loan. *Id.* at 571-72. He then
foreclosed on the loan and sued the escrow agent to obtain possession of intellectual property
being secured as collateral.[14] *Id.* Applying Michigan law, the Sixth Circuit concluded that Socia
breached fiduciary duties in forming Petroleum Enhancer while still a Polar Holding director
where the "sole purpose" of the separate company "was to divest [Polar Molecular] of its most
valuable asset—its intellectual property. *Id.* The Sixth Circuit held that Polar Holding adduced
sufficient evidence of breach as Socia had not acted in good faith towards or for the benefit of
Polar Holding." *Id.* at 574.

---

[14] "Allegedly, under Socia's plan, [Petroleum Enhancer, LLC] would purchase [the lender's] secured promissory
note, and after foreclosing on PMC's loan, recover the intellectual property that PMC had given as collateral." *Id.* at
572.

26

However, the court held that Polar Holding lacked substantial evidence to prove but-for cause. They reasoned that the company failed to create a genuine issue as to whether, absent Socia's breach, "the foreclosure would not have otherwise occurred." *Id.* The court reasoned that Polar Holding offered no evidence that, but for Socia's interference, the lender would have allowed the loan to continue in default forever, considering the severely poor financial state of Polar Molecular. *Id.* at 575. The court ultimately held that "the proximate cause of Polar Holding's loss was its weak performance as a company and its inability to repay its loan, not Socia's misconduct." *Id.* at 577.

Like Polar Holding, Plaintiff here has failed to adduce substantial evidence to reasonably prove that, absent the alleged breach, the losses Advance Watch incurred would not have otherwise occurred. Here, it is undisputed that the main goal of the Revolving Credit Facility, which was amended in 2008, 2011, and 2012, was to provide working capital from Binda Italy to Advance Watch and its affiliates. Defs.' Stmt. ¶ 13; Pl.'s Resp. to Defs.' Stmt. ¶ 13. The amendments increased the credit line to approximately $35 million and extended the life of the credit line from December 31, 2012 to December 31, 2013 and, finally, to December 31, 2018. Defs.' Stmt. ¶ 14; Pl.'s Resp. to Defs.' Stmt. ¶ 14. Gregg admitted—and the parties do not dispute—that since at least 2008, Advance Watch was not adequately capitalized and experienced delays with paying its vendors. Pl.'s Stmt. ¶ 81; Defs.' Resp. to Stmt. ¶ 81. Plaintiff also provided evidence that each year from 2009 to 2013, Advance Watch borrowed increasing amounts from Binda Italy and struggled to repay its outstanding balance even before the June 2013 Repayment.[15] Within that same timeframe, Binda Italy lost its Dolce & Gabbana license, and Advance Watch lost the Betsy Johnson license. Defs.' Stmt. ¶ 74, 75; Pl.'s Resp. to Defs.'

---

[15] Audit balance sheets list the following balances payable to Binda Italy: $21,411,902 (2009); $22,652,657 (2010); $23,513,833 (2011); $26,411,470 (2012); and $27,355,425 (2013). Burge Decl., Exs. O, P.

Stmt. ¶ 74, 75. The loss of those brand licenses resulted in millions in declining revenue and profitability for the Company. Cordero Decl., Ex. J ¶ 28-33 (Bankruptcy Decl. ¶ 28-33). Furthermore, Gregg provided a declaration on behalf of Advance Watch for the Bankruptcy that, in addition to the loss of those licenses, identified several factors attributed to the Company's ultimate collapse.[16] *Id.* Though the Court is aware that these factors are not *per se* causes of Advance Watch's losses, none of the factors in the declaration from the Bankruptcy even hint at the fact that the alleged breach caused the claimed damages. *Id.*

Plaintiff's evidence that the Board approved the FY 2014 budget showing positive financial projections would not help prove causation. The projections were based solely on the assumption that Binda Italy would continue to, and Wells Fargo would start to, finance Advance Watch. The projections merely reflected possible future forecasts of a company already in dire financial straits. A reasonable trier-of-fact would not conclude that—but for Simone Binda's alleged breach—a company that had suffered from undercapitalization and poor performance for years would not have incurred significant operational and profit losses. Regardless of what future

---

[16] Defendants argue that Plaintiff is judicially estopped from proving that the alleged breach caused Advance Watch to file bankruptcy, but Plaintiff is not bound in this manner. "A judicial admission is a statement made by a party or its counsel which has the effect of withdrawing a fact from contention and which binds the party making it throughout the course of the proceeding." *In re Motors Liquidation Co.*, 957 F.3d 357, 360 (2d Cir. 2020) (citing *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985)). A judicial admission is a statement of fact—not a legal conclusion." *In re Motors Liquidation Co.*, 957 F.3d 357, 360 (2d Cir. 2020) (citing *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005). Though the Second Circuit has not squarely ruled on this question, "the general rule seems to be that a judicial admission only binds the party that makes it in the action in which it is made, not in separate and subsequent cases." *See MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 839 n.12 (S.D.N.Y. 2016) (quoting *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 96 (S.D.N.Y. Aug. 10, 2004) (collecting cases)). Defendants have made no showing that this action would not be a "separate and subsequent case[]" to the Bankruptcy. It is neither an underlying proceeding in nor an appeal tied to the Bankruptcy. Furthermore, judicial estoppel is only applicable where "the party against whom the estoppel is claimed actually obtained a judgment as a result of the inconsistent position." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis*, 903 F.2d 109, 114 (2d Cir. 1990). Here, it is undisputed that Plaintiff entered a Settlement Agreement, which the Bankruptcy judge approved on August 2, 2016. Defs.' Stmt. ¶ 45-46; Pl.'s Resp. to Defs.' Stmt. ¶ 45-46. Though Advance Watch is not bound by the Bankruptcy Declaration, the Court may nonetheless consider it as any other piece of admissible evidence for purposes of determining whether to grant summary judgment in this case.

projections estimated, there is overwhelming evidence here that, prior to the alleged breach, Advance Watch was in a poor financial state.

For example, Plaintiff's own expert acknowledges that cash shortages were endemic to business at Advance Watch prior to the June 2013 Repayment. Goldman wrote that the Wells Fargo credit line "was meant to rectify the Debtor's problems with its vendors" and, without the full $10 million of Wells Fargo loan funds going to Advance Watch, "the Debtor *remained* in its vicious cycle of cash shortages, leading to product shortages, leading to lost sales and lower collateral values, which further exacerbated the cash shortages." Goldman Decl. 17 (emphasis added). This analysis is not inconsistent with Gregg's testimony that Advance Watch lacked adequate capitalization since 2008. Pl.'s Stmt. ¶ 81; Defs.' Resp. to Pl.'s Stmt. ¶ 81. Therefore, any potential breach by Simone Binda cannot have caused the operational and profit losses suffered by Advance Watch when cash shortages were common long before that time.[17] *See Sunnyside Resort Condo. Ass'n, Inc. v. Beckman*, No. 341116, 2019 WL 1780630, at *7 (Mich. Ct. App. Apr. 23, 2019) ("Due to [plaintiff's] inability to prove causation, the district court properly found that [defendant] had not committed the tort of breach of fiduciary duty.") (collecting cases).

Drawing all inferences in Plaintiff's favor, the evidence before the Court fails to demonstrate that the diversion of working capital caused Advance Watch's losses. "To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Skinner*, 445 Mich. at 164, 516 N.W.2d at 480. "[T]he plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the

---

[17] Plaintiff attempts to offer the emails from Advance Watch employees to show that pre-existing cash shortages worsened after the alleged breach. However, the Court discussed *infra* that the emails are inadmissible hearsay. Even assuming this evidence were admissible, they would not convince a reasonable jury that cash shortages were not already a concern for the Company long before the June 2013 Repayment.

defendant's conduct, the plaintiff's injuries would not have occurred." *Id.* at 480. Plaintiff has not satisfied his burden of establishing causation by "present[ing] evidence demonstrating a logical sequence of cause and effect sufficient to create a genuine issue of material fact." *Turkelson*, 322 Mich. App. at 620, 913 N.W.2d at 384 (collecting cases).

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is hereby **GRANTED IN PART AND DENIED IN PART**. Triable issues potentially remain only as to a claim for fiduciary breach under Delaware law against Simone Binda (see footnote 13). In accordance with the Court's Individual Practices 4.A., the Parties shall file a joint pretrial order within 30 days of the date this Order is entered.

**SO ORDERED.**

Dated: April 4, 2022

New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**